# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES,<br><br>      Plaintiff,<br><br>vs.<br><br>DEREK BRADDIX,<br><br>      Defendant. | Case No. 3:19-CR-00043-RCJ-CLB<br><br>**ORDER** |

    Mr. Derek Braddix, Nurse Practitioner, ("Defendant") moves to suppress the evidence that was acquired through the execution of a search warrant of his place of employment as well as an un-Mirandized interview that Defendant gave to officers, where he also consented to the search of his laptop. The Court finds that the warrant was soundly based upon probable cause and that Defendant failed to raise points and authorities in his motion regarding the interview. The Court consequently denies this motion and declines to hold an evidentiary hearing.

///

///

///

///

**FACTUAL BACKGROUND**

By 2018, the DEA began to investigate a family practice medical clinic, High Desert Clinic, in Fallon, Nevada after receiving anonymous complaints to the Nevada Board of Pharmacy. (ECF No. 74 Ex. 1 ¶¶ 23, 31.) At that time, Gary Ridenour, M.D., and Defendant ran the practice.[1] (*See id.* ¶¶ 2–3.) Dr. Ridenour and Defendant had Drug Enforcement Administration (DEA) registration numbers authorizing them to prescribe controlled substances on Schedules II–IV. (*Id.*)

This investigation entailed having two undercover DEA officers, outfitted with audio/video recording/transmitting equipment, act as patients of both Dr. Ridenour and Defendant, surveillance and background information establishing the locations and patterns of storage for medical records, review of the Nevada Prescription Monitoring Program (PMP), review of the criminal history of Dr. Ridenour and Defendant, and an analysis of this data by a medical expert, Dr. Timothy Munzing.

There were seven visits to the clinic by the two undercover agents detailed in the affidavit. One undercover agent attested that he visited the clinic on May 16, 2018, and on September 12, 2018, with Defendant. (ECF No. 74 Ex. 1 ¶¶ 38–57.) He acted as a new patient requesting pain medication for lower back pain and anxiety, while stating that he had an MRI that did not show any defect. (*Id.*) Defendant did not seek to obtain the images or order any type of diagnostic tests. (*Id.*) The agent stated he had taken "hydros" and "oxys" before, Defendant did not conduct an inquiry as to a drug abuse history. (*Id.*) Defendant prescribed Xanax and Hydrocodone. (*Id.*) Defendant would be willing to write prescriptions for these drugs for longer periods of time (thirty days instead of fourteen) only if the agent were willing to pay cash. (*See, e.g.*, *id.* ¶ 98.)

On February 20, 2019, this investigation culminated in the Honorable Carla L. Baldwin, United States Magistrate Judge, District of Nevada, issuing a search warrant in Case No. 3:19-mj-

---

[1] Dr. Ridenour was also a party to this action until he passed away in July 2020. (ECF No. 61.)

024-CLB for High Desert Clinic. The petition for the warrant included a 68-page affidavit by DEA Special Agent Misty Fimple.

The affidavit correctly set forth the standards for criminal liability for medical professionals contained in the Federal Controlled Substances Act, including medical professionals cannot issue a prescription for a controlled substance unless it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." (ECF No. 74 Ex. 1 at ¶ 11 (citing 21 C.F.R. § 1306.04(a)).) "It is well established that prescriptions not satisfying the requirements of this regulation, if knowingly or intentionally issued, may form the predicate for a practitioner's criminal liability under 21 U.S.C. § 841." (*Id.* at ¶ 17 (citing *United States v. Boettjer*, 569 F.2d 1078, 1080 (9th Cir. 1978)).)

In the affidavit, Dr. Munzing noted that Defendant's prescription of Xanax and Hydrocodone to the agent is a dangerous combination. (ECF No. 74 Ex. 1 ¶ 57.) He concluded that Defendant deviated from ordinary practice on this occasion in the following ways: "[Defendant] did not ask or acquire any patient history, did not ask about drug or alcohol history or abuse, did not ask about mental health history, and [Defendant] did not request old records or imaging, which are departures from the standards of care." (*Id.*)

A review of the PMP data was also present in the affidavit to Judge Baldwin. This review showed that Defendant and Dr. Ridenour both "appeared to be over-prescribing a large amount of controlled substances, specifically hydrocodone, oxycodone, and other controlled substances to patients outside the usual course of professional practice and not for legitimate medical purpose. This investigation has also revealed that [Dr. Ridenour] and [Defendant] have been accepting cash payments for a number of these prescriptions." (ECF No. 74 Ex. 1 ¶ 23.) It also showed that Dr. Ridenour and Defendant had been prescribing controlled substances to each other, which the Nevada Pharmacy Board and Dr. Munzing noted to be an irregular practice. (*Id.* ¶ 26.) Even more,

it showed that Dr. Ridenour had prescribed controlled substances to himself with refills, however, prescribing controlled substances to oneself is only permitted in a "medical emergency." (*Id.* ¶ 25.) Finally, the PMP data showed that a patient of Defendant died from "multiple drug toxicity" five days after Defendant prescribed to her 120 Hydrocodone-Chlorphen Er Susp, 180 Oxycodone-Acetaminophen 10-325, 120 Oxycodone HCL 30 milligram tablets, and 30 Zolpidem Tartrate 10mg tablets. (*Id.* ¶ 28.)

The affidavit also noted that Dr. Ridenour had previously been investigated and charged by the DEA in 1993 for the illicit distribution of prescription drugs in Nevada and ultimately pleaded guilty to an Illegal Use of a Communication Device, a felony, in violation of 21 U.S.C. § 843(b). (ECF No. 74 ¶ 24.)

During the search warrant execution, Defendant was present at the clinic along with other employees. Investigators advised Defendant that he was not under arrest, did not have to answer any questions, and was free to leave at any time. (*See* ECF No. 74 Ex. C; *see also* ECF No. 74 Ex. B.) Defendant voluntarily interviewed with investigators and provided his laptop for analysis. (ECF No. 74 Ex. C.) During the interview, Defendant was reminded that he was not under arrest and had no obligation to speak with law enforcement. *Id.*

Defendant was indicted on August 22, 2019 with Conspiracy to Distribute Controlled Substances Prescribed Not for a Legitimate Medical Purpose and Not in the Usual Course of Professional Practice, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 841(b)(1)(E), 841(b)(2) and 846, and 21 C.F.R. § 1306.04 (Count 1); Distribution of a Schedule II and IV Controlled Substances (Hydrocodone, Alprazolam ) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 21 C.F.R. § 1306.04 (Counts 2–5, 8, 11, 12); and Maintaining a Drug-Involved Premises in violation of 21 U.S.C. § 856(a)(1) and 21 C.F.R. § 1306.04, and 18 U.S.C. § 2 (Count 15). (ECF No. 1.)

## LEGAL STANDARD

The Fourth Amendment to the Constitution provides that people have the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." For warrants to be properly predicated upon probable cause, the Supreme Court has ruled that an impartial magistrate must find that there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). This determination is made upon the "totality of the circumstances," including reasonable inferences, and is a "commonsense, practical question." *Id.* This determination may be based upon evidence that is not legally competent at trial. *United States v. Ventresca*, 380 U.S. 102, 107 (1965). A warrant affidavit must set forth "particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware*, 438 U.S. 154, 165 (1978).

If a search warrant fails to meet this standard, a criminal defendant may move to suppress the evidence acquired from the warrant under the exclusionary rule. *Gates*, 462 U.S. at 222. "A magistrate judge's finding of probable cause is entitled to great deference," and courts should not find a search warrant invalid "if the magistrate judge had a 'substantial basis' for concluding that the supporting affidavit established probable cause." *United States v. Clark*, 31 F.3d 831, 834 (9th Cir. 1994).

Usually, an evidentiary hearing is not required on a motion to suppress. An evidentiary hearing is only required "when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist," *United States v. Quoc Viet Hoang*, 486 F.3d 1156, 1163 (9th Cir. 2007), or "if the defendant can make a

substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information." *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000).

**ANALYSIS**

The Court finds that a commonsense reading of the affidavit under the totality of the circumstances confirms Judge Baldwin's finding of probable cause especially considering the great deference that this Court must afford to her determination.

First, the PMP data showed that Dr. Ridenour and Defendant prescribed unusually high dosages of controlled substances for a family medical practice clinic (81% of the prescriptions were for opioids and sedatives), including to patients at their initial visits and to patients that would travel great distances to fulfill the prescriptions, such as 129 miles even though a pharmacy was located less than two miles away, and they frequently combined benzodiazepines and opioids. (ECF No. 74 Ex. 1 ¶¶ 32, 36.) Dr. Munzing found "to a high level of certainty that after review of the medical records, once obtained if they exist, that Dr. Ridenour failed to meet requirements in prescribing these dangerous medications," and "[t]he prescribing patterns are highly suspicious for medication abuse and/or diversion." (*Id.* ¶ 32.)[2]

---

[2] Defendant argues the search warrant affidavit neglects to articulate a "standard of care and thus fails to establish probable cause that Dr. Ridenour and Mr. Braddix committed any of the target offenses." (ECF No. 75 at 9.) However, this is not true. Dr. Munzing frequently stated that certain prescriptions were "without a legitimate medical purpose and are not the usual course of professional practice," which is the appropriate standard under 21 C.F.R. § 1306.04(a). Dr. Munzing noted numerous examples where Dr. Ridenour and Defendant violated traditional standards of care. For some examples, "[Defendant] wrote Norco and Xanax prescriptions based on little to no information" (ECF No. 74 Ex. 1 ¶ 48); "[Defendant] did not request old records or imaging" (*id.* ¶ 57); "[Dr. Ridenour] did not perform a physical exam" (*id.* ¶ 69); "[Dr. Ridenour] did not discuss with the [undercover agent] history of mental health" (*id.* ¶ 94); and "[Dr. Ridenour] failed to ask the [undercover agent] about the history of the pain described by the [undercover agent]" (*id.* ¶ 124).

Second, the affidavit detailed undercover agents' visits to the High Desert Clinic. One such visit, Defendant asked one of the undercover agents what the purpose of the visit was, and the agent replied, "Just refills if it's cool?" (*Id.* ¶ 72.) The agent also asked, "I was wondering if I could get a longer script, because I am running out and I can't make it in every week or every other week?" And Defendant responded, "You can if you are paying out of pocket." (*Id.*) On another visit, an agent came claiming of lower back pain, and Defendant asked if the agent had an MRI and whether he had a bulging disc. (*Id.* ¶ 41.) The agent responded he did have an MRI but "They didn't find anything really." Nonetheless, Defendant still prescribed thirty days' worth of Hydrocodone-APAP 10-325 (commonly referred to as "Norcos") because Defendant was going to pay cash. In the affidavit, Special Agent Fimple noted, "Based on my experience and training and the experience of other DEA investigators with whom I consulted, . . . it is known that a large majority of clinics that conduct unlawful opioid operations generally only accept cash paying customers which would help circumvent federal reporting requirements for Medicare/Medicaid." (*Id.*)

Third, the Nevada Board of Pharmacy notified the investigators that Dr. Ridenour twice prescribed controlled substances (Xanax and Zolpidem) to himself, which is illegal absent an emergency. (*Id.* ¶ 25.) He prescribed each with a refill that was used thirty days later. (*Id.*)

Fourth, the PMP data showed that Dr. Ridenour and Defendant prescribed each other controlled substances on numerous occasions. (*Id.* ¶ 26.) On January 23, 2019, Dr. Ridenour prescribed Defendant 140 hydrocodone-APAP 10-325mg tablets, a scheduled II controlled substance. (*Id.*) On November 30, 2018, Dr. Ridenour prescribed Defendant 120 Oxycodone-Acetaminophen 10-325, a scheduled II controlled substance. (*Id.*) On October 11, 2018, Defendant prescribed Dr. Ridenour 60 Acetaminophen-Codeine #3, a scheduled III controlled substance. (*Id.*) Special Agent Fimple notes that she spoke with Dr. Munzing as well as with a member of the

Nevada Board of Pharmacy, and both noted "it is irregular to prescribe controlled substances to a fellow practitioner in your medical practice." (*Id.*)

Fifth, the affidavit noted that Dr. Ridenour was previously investigated and charged with the illegal distribution of prescription drugs. (*Id.* ¶ 24.)

Sixth, the PMP data showed that one of Defendant's patients (Patient A) overdosed to her death within a week of Defendant prescribing her controlled substances. (*Id.* ¶ 28.) Investigators acquired a complete patient file from her son as well as the police report. (*Id.*) Based on these documents, Dr. Munzing concluded, "[T]he documentation that was provided by Patient A's son shows progress notes and care of the patient were grossly deficient, with multiple extreme departures from the Standard of Care, however, final confirmation cannot be made without further information." (*Id.*)

These points overall are more than sufficient for Judge Baldwin to conclude that probable cause existed. This is true even though many of these points may have innocent explanations as Defendant argues. Dr. Ridenour could have self-prescribed himself controlled substances as initially part of an emergency (however this would fail to explain why he prescribed himself a refill that he filled a month later). Dr. Ridenour and Defendant could have innocently been prescribing each other medications as each other's patient, even if this behavior is atypical. There could theoretically be a faultless reason for their requirement that patients pay cash for longer prescriptions of controlled substances. Nonetheless, these facts under the totality of the circumstances, while potentially innocent, "enable[d] the magistrate to conclude that it would be reasonable to seek the evidence in the place indicated by the affidavit." *United States v. Taylor*, 716 F.2d 701, 706 (9th Cir. 1983) (quoting *United States v. Hendershot*, 614 F.2d 648, 654 (9th Cir. 1980)) (noting that an affidavit need not preclude "other innocent interpretations").

///

This conclusion comports with how other courts have ruled under substantially similar circumstances. *See, e.g., United States v. Hindman*, 2008 WL 2945482, *2 (E.D. Wash. 2008) (denying motion to suppress where the affidavit outlines evidence that the defendant was the second highest prescriber of oxycodone in the state, a pharmacist indicated his prescribing habits were unusual, and several witnesses said the defendant prescribed excessive amounts of drugs); *United States v. Lievertz*, 247 F. Supp. 1052, 1061 (S.D. Ind. 2002) (denying motion to suppress where the affidavit provided information that the defendant's average dosage of OxyContin to a particular patient was higher than the recommended dosage, a pharmacy refused to fill a prescription written for an overdose amount of medication, and another physician advised the prescriptions exceeded medical necessity); *United States v. McKinney*, 695 F. Supp. 182, 195 (E.D. Penn. 2010) (denying motion to suppress where the affidavit summarized the investigation by providing details of the agents' undercover visits to the provider's office and other surveillance information).[3]

The Court finds that an evidentiary hearing is not required to rule on this motion. In the caption of the motion, Defendant stated, "Evidentiary hearing requested." Defendant however provided no argument about which issue an evidentiary hearing would resolve. There were no contested facts between the motion and the response,[4] so the Court therefore concludes that the

---

[3] As the Court affirms Judge Baldwin's determination that the search warrant application adequately demonstrated probable, the Court does not reach the Government's alternative argument that the good faith exception applies.

[4] For the first time in the reply brief, Defendant raises newly asserted misconduct allegations. (ECF No. 75 at 6–7.) The affidavit notes the undercover agents filled out questionnaires before speaking with Defendant and Dr. Ridenour during their visits. (*Id.*) Defendant posits that these questionnaires could have provided sufficient information for them to prescribe the medications. (*Id.*) He therefore concludes the Court needs to hold an evidentiary hearing to determine whether the affidavit contained "intentionally or recklessly . . . misleading omissions" and whether "the affidavit can[] support a finding of probable cause without the allegedly false information." (*Id.* (quoting *Reeves*, 210 F.3d at 1044).) The Court however will not consider additional arguments raised for the first time in a reply brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

motion does not "allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist" and declines to hold an evidentiary hearing. *United States v. Quoc Viet Hoang*, 486 F.3d 1156, 1163 (9th Cir. 2007). Indeed, whether the warrant was issued upon probable cause hinges on the sufficiency of the warrant, which is recorded on this Court's docket.

Turning to Defendant's argument that the Court should suppress his statements that he made to the police in the interview during the execution of the warrant at the clinic because he was not read his Fifth Amendment rights, the Court finds that Defendant has consented to the denial of this argument by failing to provide points and authorities in his motion. The entirety of Defendant's argument in his motion is the following: "Mr. Braddix's un-Mirandized statements to investigators must be suppressed, along with the contents of his personal laptop computer, which was not consensually provided to law enforcement, and was not named as a targeted item for seizure." (ECF No. 73 at 6.) The Court therefore denies this part of the motion under LCR 47-3, which states "The failure of a moving party to include points and authorities in support of the motion constitutes a consent to denying the motion."[5]

///

///

---

[5] In his reply, Defendant develops this argument by pointing to a news article, which noted that there were numerous fully uniformed and armed officers, so Defendant argues that he may have felt that he was in custody. (ECF No. 73.) Again, the Court does not consider additional arguments and evidence raised for the first time in a reply brief. *See Carnes*, 491 F.3d at 997. Even if this Court were to consider this evidence, the Court finds it highly dubious that Defendant could reasonably conclude that he was in custody when he was at his place of employment, told that he was free to go, and told that he did not have to speak with the agents. *See Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966) (ruling that the Fifth Amendment rights must only be read to a person before a *custodial* interrogation); *see also United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001) (noting that whether a person is in custody is based on the totality of the circumstances and is reviewed according to whether a reasonable, innocent person in such circumstances would conclude that after brief questioning, he would not be free to leave).

## CONCLUSION

IT IS HEREBY ORDERED that Motion to Suppress (ECF No. 73) is DENIED.

IT IS SO ORDERED.

Dated June 23, 2021.

_____
ROBERT C. JONES
United States District Judge